The last case this morning is case number 4111057, and it is Schwerers v. McClure, and for the appellant we have Ms. Hoff, safe? Safe. Okay, and Ms. Mosby, spot? May it please the court and counsel, my name is Adele Safe, and I represent the petitioner, Olivia Schwerers. The petitioner respectfully asserts that the trial court's custody determination in this case is against the manifest weight of the evidence and is manifestly unjust. In Vancura v. Patras, our Supreme Court noted in 2010 that a finding is against the manifest weight of the evidence when an opposite conclusion is apparent, or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. The petitioner has analyzed the trial court's section 602 findings in detail on pages 14 through 33 of her brief. I would just note that it is significant, first of all, that the court made findings regarding the minor child's step-siblings. This is significant because the minor child has no step-siblings. At the time of trial, the child had one half-sister, with whom she had a very close relationship, and a second half-sister, who is due to be born in September of 2011. The child is biologically related to her two sisters. These are not relationships based merely on marriage. The evidence showed that the minor child was anticipating her youngest sister's birth with great excitement and pride. She showed her maternal grandmother a sonogram photograph of her unborn sister and said, This is our new baby sister. The evidence showed that the minor child is closely bonded with her sister Caroline. The child is very tender towards Caroline and solicitous of her feelings, even saving some berries that she had picked for Caroline. The child and Caroline hug and kiss and say I love you to each other every night and when they are separated. The trial court's failure to recognize the important sibling bond that exists between the minor child and her sister Caroline renders its findings unreasonable, arbitrary, and not based on the evidence. Further, the trial court failed to recognize the deep bond... I think the court failed to recognize it. It may be a case of mischaracterization, but it certainly did not play a role in the court's actual findings to any great extent. Typically, when we have sibling bonds, the court is very mindful of them. But in this case, the court merely stated in its findings that the child has... that much had been made of her relationship with her quote-unquote step-siblings. Further, the trial court failed to recognize the deep bond that exists between the minor child and her stepfather, Matthew Schwerz, who has been a part of her life since the child was 10 months old. Matthew is a nuclear engineer in the U.S. Navy who has tried to teach the child and her sisters to be honest and to know the difference between right and wrong. The trial court awarded custody of the child to a respondent whose paramour was the victim in the respondent's battery conviction in 2010. A few weeks after the battery incident, respondent's paramour was transported to a hospital by ambulance after ingesting alcohol and drugs. Respondent had found her lying unconscious on her apartment floor. Petitioner testified that respondent had told her that his paramour had been threatening to commit suicide at the time that he broke down her door and found her unconscious. Further, the paramour has custody of her four or five-year-old son who was asked to leave his preschool because of behavioral issues. The evidence shows or showed that respondent's work hours were 8 a.m. to 5 p.m. at his day job and 6 p.m. to 8.30 p.m. at his evening job. That would be... I think he testified every day. Respondent, therefore, would not be at home to provide care to the minor child. So it would be respondent's paramour who is the minor child's caregiver while respondent is at work. In spite of respondent's history of domestic violence, in spite of his paramour's at best poor judgment and at worst attempted suicide, the trial court effectively made the paramour the minor child's primary caregiver. The court's custody decision places the minor child in an unstable situation as there is no marriage with a caregiver whose judgment and emotional stability are questionable. It should also be noted that the evidence showed that the minor child was sullen and mildly to petitioner after visits with respondent. Conversely, respondent offered no evidence that the child misbehaved after being with petitioner. The court's custody decision has prevented the minor child from growing up together with her sisters in a loving family and healthy environment provided by her mother and stepfather. Instead, the court has placed the child in an environment from which she has emerged sullen and mildly after visits. Petitioner respectfully asserts that the best interests of the child have not been served. Furthermore, the court bases custody decision in part on the child's ostensible relationship with her paternal grandparents. While section 602 allows the court to consider the child's relationships with her extended family, it does not give the court license to ignore the circumstances of the two parental homes where the child would primarily reside. And even if it did, the court's finding is unreasonable, arbitrary, and not based on the evidence, as it was unrebutted that the grandparents fill the minor child's baby bottle and sippy cup with soft drinks and give the child unlimited access to their candy bowl. And it was undisputed that the minor child had seven cavities at the age of three. When you say it was undisputed, I'm not sure that's correct. Wasn't it true that the other dentist found five cavities? And wasn't there evidence from the grandparents that they allowed the child to drink soda and candy but not excessively? So I'm not sure your characterization of undisputed is correct. I believe that the five cavities were discovered after the initial two were treated, but the court could be correct. If so, I do apologize. As a second argument, Petitioner asserts that the intentionally false statements of respondents' witnesses led to a result that was manifestly unjust. Respondent's stepfather, Kent Smith, who owns an auto dealership, testified falsely about the circumstances of respondents' work history with Mr. Smith's company. Respondent testified falsely about the circumstances leading up to his battery of his Paramore. In Respondent's account, he said he was trying to prevent his Paramore from driving drunk, but when his Paramore testified, she stated that it was Respondent who tried to drive drunk, and when she prevented him, he pushed her from behind and she struck her head on her vehicle. Who's supposed to resolve those conflicts? Which conflicts, Your Honor? Between those two different stories you just mentioned. I think it's up to the court to do that. So when you assert that someone lied, I thought the trial court could have resolved it the other way, couldn't it? It could have, but on the other hand, it was Respondent who was convicted of battery. On the other hand, what? It was Respondent who was convicted of battery against his Paramore. Therefore, what? Therefore, I think it's more likely, given his testimony at various times in the trial, that he was casting as positive a light on himself as possible. Did the trial judge hear these people testify? Yes, Your Honor. And we should reject the trial judge's conclusions because we think the court made a mistake on whom it chose to believe? Well, I think that the trial court did not effectively perform its truth-seeking function in that it did not focus on any of the discrepancies in testimony or even a really blatant example when the Respondent testified about allegedly finding the petitioner in a state where he said she had taken too many pills, pain pills, and then that was on direct examination. And then after being cross-examined, he gave evidence in rebuttal that contradicted his original testimony. Why couldn't the trial court have been aware of that? Pardon me? Why would the trial court not have been aware of that? The court made no findings regarding that. So, therefore, the court paid no attention? Is that your argument? Well, my argument is that under O'Neill v. Chicago Transit Authority, Respondent's testimony on direct examination constituted a judicial admission and that his change of testimony on rebuttal should have signaled to the court that he was testifying falsely. So, what I would argue here is that the court did not adequately fulfill its truth-seeking function and, therefore, the award of custody to Respondent was manifestly unjust under the circumstances. I have discussed at length the court's analysis of the Section 602 factors in both the petitioner's brief and in her reply brief, and I would simply rest on the arguments in those two briefs unless the court has other questions that it would like me to address. I see no other questions, Counsel. Thank you. I would like to address briefly the removal issue, which is, of course, tied in very strongly with the custody issue. Petitioner asserts that, respectfully, in marriage of Smith and marriage of Collingborn, our Supreme Court stated that the Eckford factors are not exclusive and that a circuit court may consider other relevant factors as dictated by the specific circumstances of each case. Here, the arguments with respect to removal are really very closely intertwined with the Section 602 arguments. Petitioner asks that the court find, that this court find, that the minor child would benefit directly from removal as she would live in a home where honesty, integrity, hard work, and education are valued. In contradiction to the child's best interest, the trial court awarded custody to an individual who has had difficulty maintaining employment, holding five jobs in five years, an individual who abused petitioner. She testified, well, they had cohabited from 2006 to 2008 and who was convicted of battery against his paramour in 2010. The court awarded custody to an individual who testified falsely at trial, said petitioner had overdosed on drugs, who was impeached on cross-examination, and who on rebuttal altered his earlier testimony. Ironically, juxtaposed with Respondent's false testimony is his paramour's admission that she was rendered unconscious after consuming alcohol and drugs. Respondent's stepfather, Kent Smith, testified falsely at trial in order to make Respondent appear to be more responsible. It is Petitioner's position that removal would permit Emma, the child, to grow up in an ethical environment. Petitioner's husband, Matthew Schwerz, testified that he and Petitioner had worked to teach the minor child right from wrong and that there were initially problems with the child's lack of truthfulness. As I mentioned earlier, I can't remember if I made this point, but with the court's indulgence I will say it again, that the child was sullen and surly after visits with Respondent, but conversely there was no evidence on the other side that the child was adversely affected by contact with Petitioner. In fact, even Kent Smith admitted that the child is a sweet little girl and that her sweetness reflects well at Petitioner. Finally, the minor child is very deeply bonded with her sister, Caroline, and was very excited about the anticipated birth of her youngest sister. Denying removal has prevented her from enjoying the incalculable benefits of growing up in the same nurturing household with her siblings. We assert respectfully that the court's decision awarding custody and denying removal is contrary to the child's best interest as it diminishes her ability to maintain deep bonds with her siblings that would enrich the rest of her life. Thank you. You will have your final. Counsel? Good morning. May it please the Court and Counsel? I represent the appellee in this case, Michael McClure. He is the father of Emma who has just turned four years old. The issues in front of this Court today really are relatively limited in scope and they are whether or not the trial court erred in granting custody of Emma to her father and whether or not the trial court erred in denying the removal petition that was requested by her mother, Olivia Sweers. The issues that I would like to address this morning are primarily threefold. Obviously, Michael believes that the Court's decisions and the rulings that were made were appropriate and in the best interest of his daughter, Emma. Additionally, the issues that I would like to focus on this morning really surround the facts and the differing view of the facts that have been asserted by the appellant's counsel in her brief as well as this morning in her argument. Second, I would like to address issues related to the trial court's assessment of the 602 factors and the appropriateness of his analysis in that regard. Third, I would like to talk about the issues related to the petition for removal, specifically the application of the accurate factors, but also the lack of evidence at trial even proffered by Olivia in regard to her request for removal. As to the facts of this case, I do believe that at least counsel for both the appellant and Appley agree that this is a very fact-based decision that the Court has to make, both in regard to custody and removal. I think the differences lie specifically in regard to what the facts are. Each of us could go through those days of trial and those witnesses and handpick various things that would identify weaknesses or strengths in our respective parties. I think that the purpose of reciting facts to this Court is to give you kind of an average or a blend of the good and bad, the perspective that the Court probably saw when he was analyzing this evidence. I think the petitioner, the appellant in this particular case, has failed to do that and instead has cherry-picked certain facts that show weaknesses in regard to the father, Michael McClure, many of which this gentleman acknowledged at trial. For example, to say that Judge Reiner didn't consider the relationships of this child in the Bloomington Normal Area or didn't consider the step-siblings because he referred to them as step-siblings instead of half-sibling is really misconstruing the ruling. If you look at the ruling, Judge Reiner, in fact, when he used the term step-siblings, put quotes around the word step-siblings. There were two children other than Emma that were discussed at trial, one of which was Caroline, which was, in fact, her half-sister who was approximately one at the time of trial. Olivia was also pregnant with her third child, but that child had not been born at the time of trial. The other young man who was a part of the step-sibling family was my client's fiancée, Megan, her little boy, who was the same age as Emma. That little boy was discussed at trial in regard to, testimony was given in regard to Emma's relationship with him, how they played together, how they enjoyed one another's company, the things they did together in the family unit. And when I'm referring to the family unit, I'm talking about who was living in Michael's home with he and Emma. And it was Michael, Megan, Emma, and Megan's little boy. Those are the children that the court assessed, and I believe when he used the term step-siblings in quotes, that's probably who he was referring to. It was not an omission or consideration of this little girl's relationship with her sister Caroline. The facts that we see in regard to my client's domestic violence conviction, yeah, he admitted that he pushed his girlfriend at the time, now his fiancée. I don't see inconsistency in regard to their testimony at trial. They both acknowledged that they were drinking and intoxicated, that they'd been out late. They both acknowledged that there was an argument at the vehicle. They both acknowledged that my client pushed her, and when he pushed her, she hit her head on the vehicle. The difference between when you look at the trial transcripts and the facts that I see and the facts that are asserted by the appellant is, in that situation, Michael said, I made a terrible mistake, and I shouldn't have done that. I realized that was inappropriate behavior, and I believe that I've changed. Did the trial judge comment on it? In his ruling? Yes. In his ruling, he only made two assessments that I can find regarding credibility issues. And those two issues in the opinion, and I'll try to direct you there quickly, were in regard to what he determined to be what I'll call his non-credible testimony of Olivia, the mother in this particular case. He specifically indicated on page 3 of his ruling, which is marked as appendix page 29 in the appellant's brief, that there were several incidences related to this observation. They are disputed by the petitioner, Olivia, but the credible testimony, as observed by the court, is supportive of the notion that petitioner's emotional stability and judgment have been problematic. Now, did he specifically say, I doubt her credibility? No. But the manner in which he asserts and makes his findings make it clear that as to her judgment and emotional instability, he doubted her credibility in regard to her testimony. On the next page, under paragraph G, he specifically says that her denial and demeanor in this regard was not credible. So I find it somewhat ironic that a large part of the appellant's case is that the judge failed to assess credibility of witnesses of Michael, when in his findings he clearly did assess credibility. His questions regarding credibility, however, were all laid upon credibility issues that he found with the petitioner. What did he say about the prior conviction of the respondent? If you look to paragraph F of his ruling, he analyzes physical violence and specifically says that the physical violence or threat of physical violence by the respondent, which is Michael, to the extent that he has allegedly been abusive to the petitioner. Now, the petitioner being Olivia, the mother of the child, which is disputed to a significant extent, and to the extent that he was conceitedly abusive to his current fiancee, is a factor which favors the petitioner's claim for Emma's custody. So he evaluated that factor and said, on that factor, custody would favor mom. But as 602 is clear, it's a balancing of all of those factors. So I believe that he did consider that incident that occurred. He did consider all of the evidence that was heard in regard to the allegations that mother had made against him and he had made against mother, which was that they both had thrown things. They both, in their young age and having a child which neither of them were very well prepared for, made decisions in regard to reacting to stressful situations, made some poor decisions. Both of them did. I don't think that's uncommon in family cases when we have children having children. What's concerning to me is in the facts of this particular case, those facts that seem to be, and have a spin on them in the brief, where they're isolated in regard to their selection, they don't show the overall picture which was presented. And the overall picture that was presented was that Michael was consistent. When he was supposed to have his daughter, he had her. He was timely for pickups and returns, unlike mom, who sometimes the evidence showed was 30 to 90 minutes late in regard to returns. He didn't post postings on Facebook saying, anyone in Champaign want a babysit tonight? I'll make sure that she doesn't get out of her crib for two hours. Those were the things that we saw. Judgment issues that were so clear from the record. Having the child's first birthday party and the birthday cake said, happy effin' first birthday. I mean, these are just judgment issues that at trial, when you heard the witnesses, it was so apparent that the judgment on mom's part was impaired. And it was impaired not only with her, but also in regard to individuals that she exposed the child to. The facts that appellant would like to assert is this is a stable marriage. And that this is going to be this perfect little picture when they go to South Carolina and live on this safe and secured, you know, a Navy base. That's not the picture that was presented at trial by the facts. The facts were that this young woman, Olivia, after returning from her honeymoon, had conversations with my client and his mother that she was unhappy. She didn't want to be married. She didn't want to take Emma to South Carolina, but she was afraid not to because she thought it would look poorly upon her. The same kind of judgment that we saw throughout, where the focus was always on Olivia and what Olivia would look like and what would be best for Olivia. But failing to consider what was best for Emma. Failing to be consistent in making good judgments and decisions. And this assertion that the primary caregiver is not going to be my client and that it's going to be his fiance, Megan, is not consistent with the record. That's clear because there was a lot of testimony in regard to the paternal grandparents having a phenomenal relationship with this little girl. Allowing the parties to live with them for a period of time. Helping them get into their own apartment. Being the daycare provider from eight weeks of age until the champagne move occurred where mom became angry and then tried to resist facilitating a relationship between Emma and her paternal grandparents and Emma and her father. Those are the kinds of things in the facts that I hope that we were able to rebut and provide the court a little more overall rounded view of what the factual basis for these rulings were. And in the judge's assessments of the 602 factors, he indicates when he's weighing on custody where this child should, who should have custody of this child, he considers it as if this child is staying in Illinois. What are the benefits and pros and cons of the child's adjustment to home and community if she stays in Illinois? And even under that assessment and analysis, he finds that factor favors Dan. The incidences that were in the record, more than 40 incidences where people observed exchanges of this child with her mother. Mother refusing to get out of the car, refusing to get off of her phone, to receive her child many times after she hadn't seen him. Was this all testified to before Judge Reiner? Yes. It is all in the record to show that. Was the mother asked about these claims? Yes. What did she say? Mother's position was she was picking up for visitation and really it was Dad's job to get the child to her in the vehicle. She tried on one occasion to assist. It didn't help. And so she just thought she would just stay in the vehicle. But the difficulty was then it was simply odd. An oddity in regard to a normal exchange where generally a parent would come and receive a child is completely absent. And as a result of that, there was also a lot of testimony, Your Honors, showing that this child responded very poorly to mother after those transitions. And those same witnesses testified they never observed that in regard to Michael receiving his daughter from his mother. His approach was different, obviously. He got out of the vehicle. But those kinds of incidences I think made the 602 analysis that the court provided very appropriate in regard to the custody decision. And this is not a situation where either of these people were primary caregivers. I mean, at a minimum, my client had the child half the time. There was evidence by witnesses to say he had the child more than half because he took his time and then he took extra time if it was made available to him up until the move to Champaign. I wanted to ask you a question. Nobody's raised this as an issue on appeal, but I had trouble understanding how the father filed a petition for joint custody. Yes. And then the mother filed a petition a few months later for removal, and the trial judge gave the father sole custody. Yes. At the time of trial and in the pretrial packets that were tended to the court, the parties both requested sole custody of the child. The reason why the court made a determination on sole custody I believe is, although the opinion doesn't say that, but there was a lot of evidence to show not good communication between the parties. There was also evidence to show that if mother was displeased with something that father did or said, she would remove the child from him as a means of punishment. There were many issues that showed there was not good communication. So I don't think joint parenting was probably effective long-term. But at the time we filed the petition, and by we I mean the time Michael filed, they were doing a 50-50 arrangement with the child. Well, both parties were aware as the proceedings started that the issue was sole custody, not joint custody. I would say at the time that dad filed his original pleading, his position was he was agreeable to continuing to do a 50-50 split. Mother was not agreeable to doing that. Her petition for removal asked for removal. As the case progressed, yes, it was very clear that both parties were seeking sole custody. But at the original time he filed his pleading, it was pro se even, and he did ask really for a continuation of the status quo. And eventually, though, was there a petition filed for sole custody or no? There were. Mediation was conducted and failed. There were pretrial documents filed that made it clear that the request was sole custody and there was no agreement to joint. And so it was apparent to all the players and the judge that sole custody was at issue. Well, but would the answer to Justice Polk's question be no? And to be certain with you, I really am not certain. I know that I filed an amended petition for custody after the pro se petition was filed, and that amended petition, I believe, and I can check my file, asked for joint custody or in the alternative any equitable belief that the court deemed appropriate. I believe that that is accurate. The petition for custody filed on December 16th of 2010 alleged that he was a fit and proper person to have joint custody and joint control and education of the minor child and that he was requesting joint legal and physical custody. In a prayer for relief, it asked for joint custody or in the alternative any other relief the court deemed appropriate. In McLean County, we have to identify in our pretrial packet our positions in regard to custody, and at that point in time both parties had made it clear that they were pursuing sole custody of the child. There was simply a lack of an agreement to do joint and an inability to communicate. And there was no objection in the trial court proceeding on that basis? No, never any objection by the respondent, the appellant in this case, and again the court was well aware that that was the decision that had to be made. As it relates to the issues related to assessing credibility of witnesses, I would just assert to the court as I did in my brief, the case law is very clear that the trier of fact is in the best position to determine the credibility of witnesses and the demeanor of witnesses. There is no evidence to indicate in this case that the judge did not do that. As it relates to the removal issue, I would assert to the court that in reviewing the totality of the circumstances, the factors that are identified in Eckert, as well as any other factor the court could deem appropriate, removal was not in the best interest of this little girl. She knew no one in South Carolina other than her mother and stepfather. There were extreme questions in regard to the stability of that relationship. There had also been evidence even asserting, in addition to emotional and judgment and mental health issues, that she had employed some of the same tactics with her husband because Caroline was born out of wedlock, that telling him he had no rights to the child, and there had even been conflicts between the two of them prior to marriage, which really mirrored the same kind of response she had provided to Michael, which we believe strongly supported the determination by the court that mother simply didn't have the ability to facilitate the relationship between Michael and Emma. As he had shown, he did have that ability to facilitate that relationship between Emma and her mother. Thank you.  Rebuttal, please. Counsel has noted or stated that the child's younger sister, Caroline, was approximately one at the time of trial. That is actually inaccurate. The child, Caroline, was nearly two years old. At the time of the trial, she was born in September. She was celebrating her second birthday in September of 2011, so there is this significant relationship between the three-year-old and the two-year-old, the three-and-a-half-year-old and the nearly two-year-old. Counsel refers to the paramount son and a relationship between him and the minor child, but there is no legal relationship here between the respondent and his paramour as they are not yet married. This is a little bit of an oddity because typically people will get married when they come to trial on a custody matter, but the respondent and his paramour were not married. Counsel refers to credible testimony. In regard to this, I would assert that under Chicago Park District versus Chicago and Northwestern Transportation Company, which I referenced in my brief, in the reply brief, here the reviewing court stated that where there is intentionally false statement, the determination of witness credibility is not a controlling factor. In that case, a plaintiff had fallen off a bus and had admitted at trial that he had had a couple of drinks, he had no occurrence witnesses, but the defendants produced a number of witnesses who testified that the plaintiff was intoxicated, had fallen off the bus because he was unable to keep his balance. The plaintiff then tried to file an amended complaint incorporating the testimony of the witnesses at trial, and the court said this was simply not acceptable because, I'm sorry Your Honor, I'm referring to the O'Neill case. In the Chicago District case, that was where a child had been hurt, had been injured by a train, and the Park District had actually falsified documents to show that it had done inspections of a fence, that the child had climbed through a hole in the fence, and in that case the court stated that the existence of intentionally false statements does not rest on a determination of witness credibility or disputed facts. I bring this up, and I've gone into it in some detail, because the court... Are you suggesting that case gives this court reason to disregard the credibility findings... No, not at all, not at all, Your Honor. ...made by Justice or Judge Reiner? Not at all. No? But my point is that the court, Judge Reiner looked at the credibility of the petitioner and really turned a blind eye to the false statements made by the respondent. When the court asked counsel whether there was an explanation about why the petitioner was on the telephone when she went to pick up the child, I think counsel mischaracterized the evidence because the petitioner stated clearly that she felt very uncomfortable in approaching the driveway with the family there who were very disapproving of her, and therefore she did state in the court she was always on the phone because if she couldn't bring someone with her, she wanted to have somebody that she could talk to just to make herself feel more comfortable. I think there was a question also as to whether the petitioner had rebutted or what her testimony was with regard to her conversations with the respondent and his mother about her marriage. And the petitioner did testify that the characterizations or the accounts, the testimony by the respondent and his mother were not accurate. The marriage that she has with her husband, they have been together since 2008. They experienced some initial bumps in the road, but the testimony was that by herself and by her other witnesses that the marriage is not very stable. Okay. Thanks to both of you. The case is submitted. The court stands in recess until this afternoon.